IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Arlette Parker, As Administrator of the Estate of Edward Parker, Deceased,<br><br>　　Plaintiff,<br>v.<br><br>United States of America,<br><br>　　Defendant. | Case No. 20 C 5496<br><br>Hon. LaShonda A. Hunt |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Arlette Parker, as administrator of the Estate of Edward Parker, brings this medical malpractice action arising from the death of her husband at a Veterans Affairs Hospital, under the Federal Tort Claims Act, 28 U.S.C. § 1346 *et seq*. With all discovery completed, Plaintiff has now moved for summary judgment on liability only. Defendant United States of America opposes the motion. For the reasons discussed below, Plaintiff's motion for partial summary judgment [43] is denied.

**BACKGROUND**

The facts are mostly undisputed and taken from the parties' Local Rule 56.1 statements. On April 27, 2019, Edward Parker ("Parker") underwent an overnight sleep apnea study at the Edward Hines, Jr., VA Hospital (the "Hospital"). Around 5:30 a.m. on April 28, 2019, Parker fell while he was getting dressed to leave the Hospital. A technician who heard the thud entered the room and found Parker on the floor, bleeding from a wound to his head. Parker was conscious and able to respond. While the rapid response team was assisting Parker to a standing position, he complained of dizziness, and subsequently fainted and suffered a second fall and seizure-like

movements for approximately 45 seconds. Parker was transferred to the Hospital's Emergency Room (ER), where he arrived at approximately 6:02 a.m.

Dr. Edward Villa was the attending physician when Parker presented in the ER. Dr. Villa did not normally work at the Hospital, nor was he a board certified or trained ER physician. Parker's breathing was rapid and then labored, his pulse was elevated, and his oxygen saturation level was low. He had no chest pain or signs of deep vein thrombosis, and his lungs were clear. Dr. Villa performed an "expedited workup" of Parker and ordered tests, including a CT scan of the head and spine, an ECG, and blood work. Dr. Villa also requested consults from Neurology and Critical Care (MICU) to see where Parker should go from the ER. Parker remained in the ER under the care of Dr. Villa until Dr. Villa left at approximately 7:00 a.m.

From 7:00 a.m. until 11:00 a.m., Parker was under the care of Dr. Fred Rothenberger, a board-certified, trained ER physician who had been practicing emergency medicine for over 20 years. Dr. Rothenberger did not take his own history or perform his own examination of Parker. It was his custom to rely on the predecessor ER physician. Dr. Rothenberger did, however, remove Parker's cervical collar and repair Parker's scalp laceration.

Dr. Pavan Gupta, a first-year resident, and Dr. Ciaran Cunningham, Critical Care Pulmonology Fellow, were the critical care doctors on duty. Dr. Gupta took a partial medical history of Parker and discussed it with Dr. Cunningham, but there is no record that Dr. Cunningham saw Parker. Neither Dr. Gupta nor Dr. Cunningham recommended that Parker be admitted to the ICU.

Dr. Jeremy Schmitz, a resident in neurology, and Dr. David E. Kvarnberg, the attending neurologist, saw Parker in the ER in connection with Dr. Villa's request for a neurology

consultation. The neurology service found Parker appropriate for admission, and he was admitted around 11:00 a.m. with a cardiac monitor.

Around 3:15 a.m. on April 29, 2019, Parker had difficulty breathing. He died at 4:25 a.m., approximately 22 hours after he was admitted to the ER, as the result of acute pulmonary thromboemboli (i.e., multiple pulmonary embolisms). Although Parker had multiple clinical signs and symptoms and risk factors for possible pulmonary embolism ("PE"), Dr. Villa did not consider PE or request additional tests to rule it out. None of the other VA doctors involved in Parker's care at the Hospital on April 28 or April 29 tested him for PE either.

In this lawsuit alleging negligence by the VA doctors who treated Parker after his fall, Plaintiff retained Dr. Edward Michaelson, Dr. Robert Irwin, Dr. Vibhav Bansal, and Dr. Omar Darwish to testify as her experts. Plaintiff contends the standard of care requires that PE be promptly considered in a differential diagnosis, ruled in or out (using a D-dimer test or CT angiogram of the lung, for example) and treated (with anticoagulants such as heparin, for example). Consequently, Plaintiff asserts that (1) Drs. Villa, Rothenberger, Gupta and Cunningham breached the standard of care by failing to timely diagnose and treat Parker's PE; (2) Dr. Rothenberger breached the standard of care by not conducting a second examination of Parker; and (3) Drs. Gupta and Cunningham failed to conform to the standard of care since Parker was not evaluated by the attending ICU physicians.[1]

Defendant retained Dr. James Richardson and Dr. John Kress to testify as its experts. Defendant admits that Parker's PE was not promptly diagnosed or treated but disputes whether

---

[1] Although Plaintiff's complaint alleges negligence by the neurology team—Dr. Schmitz (Count III) and Dr. Kvarnberg (Count IV)—she does not argue in the instant motion that they breached the standard of care. Moreover, Plaintiff's expert, Dr. Bansal concluded that "the actions of the neurology team. . . conformed to the standard of care[;]" thus, any argument to the contrary would likely be rebutted by Plaintiff's own evidence.

3

any of the VA doctors deviated from the standard of care or if earlier treatment would have changed the outcome.

## LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the summary judgment stage, the court's function is to "determine whether there is a genuine issue for trial," not to make determinations of truth or weigh evidence. *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087 (7th Cir. 2018). "A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016). All facts and inferences are construed in the light most favorable to the nonmoving party. *Nischen v. Stratosphere Quality, LLC*, 865 F.3d 922, 928 (7th Cir. 2017).

## DISCUSSION

To prevail on a medical malpractice case in Illinois, a plaintiff must prove "(1) the proper standard of care by which a physician's conduct may be measured, (2) a negligent failure to comply with the applicable standard, and (3) a resulting injury proximately caused by the physician's lack of skill or care." *Massey v. United States*, 312 F.3d 272, 280 (7th Cir. 2002) (citing *Simmons v. Garces*, 319 Ill.App.3d 308, (2001) and *Diggs v. Suburban Med. Ctr.*, 191 Ill.App.3d 828 (1989)). Expert testimony is typically required to establish the elements of a medical malpractice claim. *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 461 (7th Cir. 2020) (citing *Prairie v. Univ. of Chi. Hosps.*, 298 Ill.App.3d 316, 321 (1998)).

Plaintiff contends that summary judgment on the issue of liability is proper because no material facts as to her medical malpractice claim are in dispute. Defendant disagrees and points to the contrary opinions of its experts about the standard of care and causation. Having considered

4

the submissions of the parties and the relevant case law, the Court finds that material fact disputes exist that render summary judgment inappropriate.

Three of Plaintiff's experts—Drs. Michaelson, Irwin, and Bansal—opined that Drs. Villa, Rothenberger, Cunningham, and Gupta breached the standard of care by failing to timely diagnosis and treat Parker's PE. Defendant's expert, Dr. Richardson, reached the opposite conclusion specifically as to Dr. Villa. Plaintiff nonetheless contends that Dr. Richardson's opinion fails to create a material question of fact because his report does not delineate a specific basis for this opinion. An "expert report must supply the basis for the opinion, but need not give a primer on why the facts allow the expert to reach the conclusion or answer all potential challenges to the opinion in order for the opinion to be given weight in a summary judgment proceeding." *Johnson v. United States*, No. 06 C 4733, 2008 WL 4722080, at *3 (N.D. Ill. Oct. 16, 2008) (citing *Vollmert v. Wis. Dept. of Trans.*, 197 F.3d 293, 300-01 (7th Cir. 1999) (internal quotations and modifications omitted). Indeed, "[t]he purpose of these reports is not to replicate every word that the expert might say on the stand. It is instead to convey the substance of the expert's opinion (along with the other background information required by Rule 26(a)(2)(B)) so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary." *Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009).

Plaintiff presumably had an opportunity to depose Dr. Richardson during expert discovery and further explore the basis for his final opinion that "Dr. Villa's treatment of Mr. Parker given his presentation and improvement of the vital signs did not deviate from the standard of care." *See* Dkt. 45-2.[2] Certainly Plaintiff points to nothing in the record to suggest that she sought to depose

---

[2] This case was reassigned to the calendar of Judge Hunt on June 2, 2023 [56]. In reviewing the docket, the Court notes that the parties filed a joint status report on November 10, 2022 [40], indicating that all expert discovery was completed. Plaintiff then filed this motion for partial summary judgment on November 18, 2022 [43].

5

Dr. Richardson and was prevented from doing so.[3] And yet, Plaintiff urges the Court to deem his report so deficient that his expert opinion should be disregarded entirely. To an extent, Plaintiff correctly notes that Dr. Richardson's final opinion is sparse, covering only one paragraph, and does not address each point of contention raised by Plaintiff's experts. But when the entire three-page report is considered as a whole, the Court finds that it paints a more fulsome picture to support his medical reasoning. For example, Dr. Richardson identifies the documents reviewed, i.e., Hospital records, deposition transcripts of the VA doctors, and Plaintiff's expert reports, summarizes the medical care provided by Dr. Villa and Dr. Rothenberger, and explains the general standard of care in emergency medicine, including the risk of PE in patients with syncope. More importantly, Dr. Richardson provides a rationale for his conclusion—Parker's presentation in the ER and subsequent improvement.

Not surprisingly, Plaintiff's experts vehemently disagree with Dr. Richardson's assessment. They emphasize the medical testimony showing Parker's obvious signs of increasing distress due to untreated PE before his untimely death. But "disagreement in the expert testimony merely demonstrates the need for a factfinder to determine how much weight and credibility to afford each expert's testimony, thereby creating a factual dispute that precludes summary judgment." *Heth v. Fatoki*, No. 19-CV-01096, 2023 WL 6213712, at *5 (N.D. Ill. Sept. 25, 2023). *See also Gicla v. United States*, 572 F.3d 407, 414 (7th Cir. 2009) (noting that a "battle of the experts" requires "the factfinder to determine what weight and credibility to give the testimony of each expert and physician"). As such, the strength (or weakness) of Dr. Richardson's opinion is a question for the trier of fact to assess at trial.

---

[3] Plaintiff attached to her Local Rule 56.1 statement several deposition transcript excerpts of the VA doctors and her experts. *See* Dkt. 45-6 at Exh. F. As far as the Court can tell, no deposition testimony from Dr. Richardson was included.

Regarding the other VA doctors, Drs. Rothenberger, Cunningham, and Gupta, Plaintiff contends that Defendant failed to provide any expert opinion regarding their negligence. But the Court sees no reason why Defendant would not be allowed to rely upon the same expert testimony that Dr. Villa's conduct did not fall below the standard of care to show that the VA doctors who followed Dr. Villa and relied on his work, also could not have breached the standard of care. True, Dr. Richardson expressly rendered an opinion as to Dr. Villa and did not mention the other doctors by name. And Plaintiff's experts appear to opine that Drs. Rothenberger, Cunningham, and Gupta each breached their respective standards of care in distinct ways. Still, Plaintiff bears the burden of proving her claims. Defendant is not required to put forth any expert testimony in response. *See Smith v. Bhattacharya*, 2014 IL App (2d) 130891, ¶ 14, 11 N.E.3d 20, 23 ("[W]here expert testimony is required to establish the applicable standard of care, it is well settled that the testimony of the defendant doctor may suffice to establish the standard.")

Relying on Drs. Michaelson and Irwin, Plaintiff maintains that Dr. Rothenberger breached the standard of care by not doing a second history or reexamination of Parker. But Dr. Rothenberger countered that it was not his custom to conduct a second examination of a patient who had already been seen by an ER physician; thus, he testified that reviewing the chart notes and following up on the consultations requested by Dr. Villa were adequate. Similarly, relying on Dr. Bansal, Plaintiff contends that the ICU team of Drs. Cunningham and Gupta should have evaluated Parker themselves. It is undisputed, however, that Dr. Gupta did in fact evaluate Parker for ICU admission and communicated his findings to Dr. Cunningham. Essentially, Plaintiff and her experts insist that at some point during Parker's five hours in the ER, the VA doctors should have taken steps to rule in or rule out PE. Whether that is true *and* their failure to do so fell below the required standard of care is for the factfinder to resolve when weighing competing testimony of the witnesses.

Similarly, it is undisputed that Parker died of PE that was not timely diagnosed and treated. Plaintiff claims the VA doctors deprived Parker of the chance to survive or increased the risk of his death. Defendant says that Plaintiff cannot prove causation since the experts disagree about whether timely treatment would have altered the outcome.

"Proximate cause in a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible. To establish proximate cause, the plaintiff must show cause in fact and legal cause. Cause in fact exists when there is a reasonable certainty that a defendant's acts caused the injury or damage. To prove legal cause, a plaintiff must also show that an injury was foreseeable as the type of harm that a reasonable person would expect to see as a likely result of his or her conduct." *Morisch v. United States*, 653 F.3d 522, 531 (7th Cir. 2011) (internal quotations and citations omitted). Causation is "typically a question reserved for the jury." *Moore v. Wexford Health Servs., Inc.*, No. 19 CV 3892, 2023 WL 4492118, at *12 (N.D. Ill. July 12, 2023). And an expert's opinion on the connection between a delay in treatment and injury must be factually supported in order to be submitted to the jury. *Miranda v. Cnty. of Lake*, 900 F.3d 335, 348 (7th Cir. 2018).

As with the standard of care, there is expert testimony on both sides regarding causation. Dr. Darwish opines for Plaintiff that he is "confident" Parker had a high probability of surviving if certain standard treatments had been timely initiated. In contrast, Dr. Kress opines for Defendant that because Parker arrested in less than 24 hours after his admission to Hospital, it is "more probably true than not" that anticoagulation would not have changed the outcome. Dr. Richardson similarly opines for Defendant that "it is doubtful" that any treatment would have changed the outcome.

8

Again, the Court finds this type of "conflict between competing expert opinions presents a classic jury issue that precludes determination at the summary judgment stage." *Morris v. Obaisi*, No. 17-CV-05939, 2023 WL 2745508, at *6 (N.D. Ill. Mar. 31, 2023). In deciding summary judgment, courts "[do] not make determinations as to which expert's opinion is more credible." *Id.* That is the province of the trier of fact. Both sides point to medical studies in support of their respective positions about the relationship between the start of treatment and PE survival rates that underscores the existence of disputed issues of fact on the question of causation. *See Caruth v. Wexford Health Sources, Inc.*, No. 16-CV-6621, 2023 WL 6141310, at *6 (N.D. Ill. Sept. 20, 2023).

Plaintiff argues that Defendant is raising a Parker "would've died anyway" argument that is prohibited by Illinois law. Under the lost chance doctrine, "proximate causation exists if plaintiff can show to a reasonable degree of medical certainty that defendant's conduct proximately increased the risk of harm or lost chance of recovery." *Meck v. Paramedic Servs. of Illinois*, 296 Ill. App. 3d 720, 722, 695 N.E.2d 1321, 1323 (1998). The Illinois Supreme Court has held that "the lost-chance theory of recovery does not relax or lower a plaintiff's burden of proving causation. To the contrary, the requirement that causation must be shown to a reasonable degree of medical certainty conforms to traditional principles of proximate cause. Therefore, to the extent a plaintiff's chance of recovery or survival is lessened by the malpractice, he or she should be able to present evidence to a jury that the defendant's malpractice, to a reasonable degree of medical certainty, proximately caused the increased risk of harm or lost chance of recovery." *Freeman v. Crays,* 2018 IL App (2d) 170169, ¶ 24, 98 N.E.3d 571, 580 (internal quotations and citations omitted). Defendant disagrees that a "lost chance" instruction would be appropriate here.

9

The extent to which the lost chance doctrine might apply is not an issue the Court must definitively answer in order to rule on summary judgment. Rather, it can be decided before or at trial, depending on the evidence presentation. At this juncture, the question is whether Plaintiff has proven causation as a matter of law based on a comparison of expert reports submitted by each side. The Court concludes that she has not. The mere fact that Parker was never tested or treated for PE during his five hours in the ER and then died from PE about seventeen hours after leaving the ER does not establish a direct connection between the delayed diagnosis and his injury to a reasonable degree of medical certainty.

In sum, "questions of negligence, due care and proximate cause are ordinarily questions of fact for the jury to decide and become questions of law only when the facts are undisputed or there can be no difference in the inference a jury could draw from the facts." *Harms v. Lab'y Corp. of Am.*, 155 F.Supp.2d 891, 909 (N.D. Ill. 2001) (internal quotations and citations omitted). This case clearly involves conflicting opinions about what constitutes a breach of the standard of care and if proximate cause exists. Because a reasonable trier of fact "could draw different inferences given the evidence in this case[,] [s]ummary judgment on the issue of liability . . . is inappropriate." *Id.*

## CONCLUSION

For all the reasons stated above, Plaintiff's Motion for Partial Summary Judgment [43] is denied.

**Dated: April 11, 2024**                **ENTERED:**

*LaShonda A. Hunt*
**LASHONDA A. HUNT**
**United States District Judge**

10